Good afternoon, Your Honors. Brian Murphy on behalf of Oscar Aguilar. I will use ten minutes of my argument time. I will reserve five minutes for my colleague, Ron Mercaldo, to do rebuttal. We agree with the proposition that Mr. Aguilar was not entitled to a perfect trial, but to a fair trial. We dispute that he received a fair trial. The first basis that we say this is the following. John Dawes, Ph.D. and a tire expert, was allowed to testify as follows. I've looked at the tire on the car that went flat with Nancy Brand. I've determined that that was driven more than one mile, but less than three miles while flat. And on this basis, they argued to the jury that she was responsible for her own death. She could have pulled over for a three-mile period. She could have taken exits, but instead she kept driving down the highway. Here is the factual basis for this. He worked at Michelin until 2001. While there, he did run-flat testing. They did it at three distances, a quarter mile, a half mile, and three miles. There was no testing of anything more than one mile or less than three miles. The only test that he testified to that involved that distance was testing he did in 2012, some 11 years after he left Michelin, in an unrelated case where he drove a Firestone tire that was new, 1.2 miles. This was the sole factual basis for his ability to state, I know what happens between mile one and mile three. Counsel, this is sounding to me like a very good closing argument to a jury, but that's not what we're hearing. The jury disagreed with you.  Put it in the proper context. So what should we do with that? The Daubert test is the proper context. And I would note the following. While this is reviewed for an abuse of discretion standard, this Court, in its decision in the, well, I'll come to that in a moment, has decided that you are equally capable, that's the estate of Barabin v. Aston Johnson case, that this Court has the equal capacity with the district court to evaluate the Daubert factors. And what we would say Daubert and Kumho tire stand for is the following. There must be some objective basis for reliability demonstrated before an expert can take the stand and testify. Here we have the following. There was no testing done beyond the fact that he looked at the tire. There has been no general acceptance of this in the scientific community. He testified he doesn't know of anyone else who has done this particular testing. There's no peer-reviewed publications. Now, those are not exhaustive factors under Daubert, but there must be something objective to demonstrate reliability, and that is what is lacking here. This, as in General Motors v. Joyner, was based on the ipsy-dixit of the expert and nothing more. That meant we could not cross-examine this gentleman. We couldn't find another expert to testify against him. His testimony was unopposed and unopposable and was all based on his subjective evaluation of one tire with a very weak factual background. And Counsel, you were precluded from bringing your own expert? Your Honor, we didn't find another expert. We don't know anyone else in the world who claims to have this expertise, and Mr. Dawes or Dr. Dawes could not identify anyone else either. He said, I don't know anyone who's done this. I suspect my competitors have, but I can't say that. But the essence of it is that is one of the problems that we faced in allowing this kind of testimony to come forward. The record establishes that where harmful, that where expert evidence is allowed in, harmful error is presumed if that is erroneous. And here the proponent of the evidence bears the burden of proving it was not harmful. That cannot accomplish here. The jury was instructed that, I quote, fault is negligence that was the cause of Nancy Brand's death, unquote. That meant that they could argue to the jury Nancy Brand was exclusively at fault, exclusively the cause of her own death. Even if Mr. Maupin was negligent, he is not causally responsible. And that was very damaging. We also were limited with regard to Peter Philbrick's testimony, our expert on commercial driving. We laid a very careful foundation about his background as a driver, 3 million miles without an accident, Smith defensive driving experience, working as a John Gear safety engineer, 16 times. And I may have undercounted them. The court sustained foundation objections despite trying to build this. At the end of the day, those objections went to whether he had reviewed the scene and seen it at night, whether he'd reviewed photographs of the scene, whether he would be expected a commercial driver would be able to observe a vehicle from a quarter mile away, whether a commercial driver would, whether there's a suggestion of inattentiveness if he doesn't even attempt to brake until 100 feet before the collision. All of that was held out. At the end of the day, he was allowed to testify to the following. I think he was below the standard of care, but the justification for that, why he said that, the rationale behind his opinion was kept away from the jury, and that was extremely damaging. Even though the information that he was precluded from testifying to, the electronic control module information, his own personal observations are expressly allowed under Rule 703 as the basis for expert testimony. We were also precluded from allowing the final opinion of Dr. Stein, our human factors expert, when he was asked, based on your training and experience, what do you believe was the cause of the accident which claimed Nancy Brown's death? His answer would have been, as we said in his report and his deposition, inattentiveness on the part of the driver, Mr. Maupin, but he was not allowed to say that to the jury. Unless the Court has questions, I'll go to our second basis, that the weight of the evidence here clearly stated that there was negligence on the part of Mr. Maupin. We don't dispute that there was a factual basis that would allow the jury to assign fault to Nancy Brown, but what we state was wrong is that under these factual circumstances, there was no reasonable way that you conclude that Mr. Maupin was not negligent to some degree. These facts were undisputed. It was a well-lit area. Nancy Brown had two sets of backlights on. Many other vehicles saw and steered around her. Mr. Maupin first activated his brakes at the space of 95 to 190 feet from the point of impact, and from one to two seconds before the accident, his throttle was fully engaged at 64 miles an hour. There's a speed limiter that wouldn't allow it to go faster than that. I won't even talk about our expert testimony. Let's talk about what their expert in human factors, Mark Edwards, said. This vehicle should have been visible to Mr. Maupin at 900 feet. At 600 feet, he should have known that he was closing so rapidly that some evasive action was necessary. And at 438 feet, he should have known with precision how fast he was closing. But he said as follows. At 600 feet, he should have been able to change lanes and should have known that he needed to do so. Well, the jury considered that testimony and considered Dr. Edwards' testimony to be more persuasive. That's correct. The question is, was that conclusion reasonable under the circumstances? Was that against the clear weight of the evidence? And we state the following. The assumption that the jury was told by their expert, Mr. Edwards, was this. Why did Mr. Maupin delay applying his brakes? Because for two seconds or so, he was checking his mirrors, and only when he found out he could not change lanes did he apply his brake, and I say that's reasonable. That assumption was entirely unfounded by the evidence. Mr. Maupin testified as follows. And I'm quoting from the civil docket at item 197-2, exhibit 2. Question. Did you take the time to check your side mirrors to see whether there were any vehicles? Answer. That's why I went to the left. It was clear. He testified the left lane was clear, and he could have changed lanes. But Dr. Dawes, pardon me, Dr. Edwards took the position that he couldn't change lanes, therefore he applied the brakes. There was no factual basis for that. And the Court's ruling on our motion for new trial expressly adopted that testimony of Mr. — of Dr. Edwards, stating, oh, he couldn't change lanes, therefore his conduct was reasonable. That was clearly erroneous, I submit, and completely unsupported by the evidence. I will talk, finally, about the following, judicial bias. I know this is a sensitive subject, but it's one that we must address, one that we took very seriously at the trial level and take seriously here. We've cited the case law for the following. The trial judge's role in the courtroom is overpowering. The jury pays great attention to what he says. And any demonstration of bias or any demonstration of favoritism, the appearance of that creates a due process problem. And we've cited Arizona v. Fulminati for the problem that where judicial bias is demonstrated, harmful error need not follow. That's a structural error in the fairness of the trial process. Here, we put on Mr. Filbin, our expert in commercial trucking, and I've talked about the many objections that were made. He, at one point, he being Judge Liu, said, you are not the witness. Why he said that, I don't know. But he said that, and the transcript shows it very clearly. That was a negation of his testimony. That was a statement to the jury, this is not a credible witness. And immediately after testimony finished that day, the judge summoned Mr. Mercaldo, and he will testify to this or talk to the panel about this more accurately. He will come and discuss what happened in Chambers where only he and Phil Stanfield, the defense attorney, were called. And there the judge said, there won't be runaway verdicts in my courtroom. That was a demonstration of why, just before that, he had slammed the door on allowing Mr. Filbin to talk. He was cutting the numbers down. And after the trial, the record reflects the following. I don't know that justice was truly done. It's a big swing one way or another. I was hoping to get you guys in the middle somewhere. And I'm going to close by making a brief reference to the following. This Court has recognized this circuit on some 15 occasions that cumulative error may justify reversal, even if the individual errors do not justify reversal. This is the perfect case for this, I submit. Every aspect of this proceeding was undermined. And unless the panel has questions, we'll reserve time for rebuttal. Thank you. Good afternoon, Your Honors. May it please the Court, my name is Jennifer Anderson, and I represent Warner Enterprises and Ronald Maupin. Your Honor, this is a case that frankly could have gone either way. Defendants presented expert witness testimony saying that Mr. Maupin acted appropriately as soon as he should have realized the need to do so. Defendants presented an eyewitness who said there was a vehicle to Mr. Maupin's left, there was a vehicle to his right, and Mr. Maupin could not make a safe lane change. Obviously, plaintiffs presented witnesses who said the opposite. But after a full and fair trial, the jury simply decided to believe defendants' witnesses over plaintiffs. That's what trials are for. That doesn't mean that the verdict is contrary to the evidence or the product of judicial bias. The Court should affirm the jury's verdict and the decision not to order a new trial. And I will touch on the points I wanted to make and then also work in some responses to the appellant's argument. First of all, I want to start out with Dr. Dawe's testimony. This is a red herring. The jury determined that the defendants were not liable. The issue of comparative fault did not even enter into the case because the jury determined that the defendants were not liable. Dr. Dawe's testimony went completely to the issue of Nancy Brand's comparative fault in continuing to drive a vehicle for one to three miles on a flat tire. The jury was specifically instructed, and I'll read you the instructions or the main instruction. The jury was specifically instructed in instruction number eight, if you find that defendants Werner Enterprises or 18, I'm sorry, if you find that defendants Werner Enterprises and Ronald Maupin were not at fault, then your verdict must be for the defendants. If you find they were at fault, you know, then you basically, to summarize, go on to determine whether Ms. Brand was at fault. The jury, the verdict form also walked the jury through. The first question, were the defendants at fault? No. You don't even consider comparative fault. So Dr. Dawe's testimony had no bearing on this verdict whatsoever. It's a complete red herring. Turning to the actual merits of the argument, Dr. Dawe's testimony was properly admitted. The district court did not abuse its discretion. Cases like Kumho Tire, this Court's decision in Daubert II and Primiano illustrate that the Daubert factors, and actually Primiano and Kumho are the two main ones, the Daubert factors are not, they're flexible. It's a flexible test, and those are not the only considerations that a district court can take into account when deciding whether expert testimony is reliable. And that is particularly true whereas here you don't have scientific opinion testimony. This is experience-based technical testimony of a tire expert. And so, you know, the district court took into consideration Dr. Dawe's long experience with tires at Michelin, his experience with run-flat testing, and as counsel points out, the fact that Dr. Dawe's had done the exact similar test in a prior case, and in Daubert II, this Court actually said that that is the kind of thing that strengthens the reliability of an expert's testimony when the expert held that, you know, did the testing or engaged in similar testing even before the case, before becoming involved in the case. So, and you don't, it doesn't have to be peer-reviewed, it does not have to be published, and counsel ignores that run-flat testing, it's not rocket science. You take all your air out of a tire and you run the car for a distance and you look at the inner liner, different distances, and you compare them. And Dr. Dawe showed that at less than one mile is very little abrasion on the inner liner. One mile was, you know, a certain amount, and more than that was even higher. And so, you know, it's something that regardless of whether plaintiffs could have found an expert who had actually done this testing before, could easily have done it for purposes of this case. So, and counsel had, plaintiff's counsel had ample opportunity to cross-examine Dr. Dawe's and, in fact, did so. Maybe I misunderstand something, but your first argument is that the plaintiff's negligence is irrelevant because that was only for comparative negligence purposes. Yes. But your argument now about plaintiffs, how far you go in a tire, isn't that also the same? You're talking about plaintiff's negligence, which you say is irrelevant? I apologize if I wasn't clear, Your Honor. I think my only point is the testimony had no bearing on the verdict. But even assuming that it did, it was properly admitted because this is the type of testing that plaintiffs could have retained another expert to do. So unless the court has any further questions on that particular issue, I think I'll move on. Turning to the issue of the fact that the district court did not abuse discretion in refusing to order a new trial for judicial, for alleged judicial bias and misconduct, this, obviously, litigants are entitled to a fair and impartial judge. Absolutely. Judges cannot express opinions on ultimate issues of fact for the jury. They can't argue on behalf of one of the parties. Neither of those is what happened here. Trial courts have wide discretion to engage in questioning of witnesses, clarifying answers, and, in general, controlling the orderly presentation of the evidence. And a new trial is only warranted if there's evidence of actual bias or an abiding impression that the judge's remarks in questioning project to the jury an appearance of advocacy or partiality. And the case law of this circuit, at least, is clear that in a civil trial, certainly, you need to show that the alleged misconduct had a prejudicial effect on the trial. Counsel, what was the purpose of the judge's comments as to Mr. Aguilar's or Ms. Aguilar's reference to being from another country? Yes, Your Honor. The judge explained in his order denying a motion for new trial that he was — the context is that Mr. Aguilar was explaining courtship traditions in his native country of Guatemala. And the judge, who is the son of Chinese immigrants, Mr. Aguilar talked about his country. The judge merely asked to clarify, when you say your country, do you mean the United States? You're a citizen. I think he said, are you referring to the U.S. or Guatemala in response to his testimony about his country? And — But I think he said, because you're in the United States or something to that effect. I think he said that you're a United States citizen. Right. Right. And so the trial judge, who's there and can see the jury, is in the best position to assess whether this kind of clarification is needed. I certainly don't think it shows any bias or prejudice towards people from Guatemala or immigrants, of which the judge's own parents were. He is merely trying to clarify. And if I could just — on the very next page, if you look at the very next page of the transcript, plaintiff's counsel asks the same question. He asks, when I asked you about your country, what do you consider your country now? And that's document number 211 at page 360. So there's no abuse of discretion in determining that this would not convey to the jury judicial bias or partiality against Mr. Aguilar. He was not, again, not trying to argue against him. He was simply trying to clarify what Mr. Aguilar meant by his country. As far as the Foundation sustaining the objections against Mr. Philbrick, first of all, the rulings were correct. I mean, if you look through the questions, and the judge's order denying the motion for new trial explains this very well. Basically, they could be categorized in sort of three groups. First of all, plaintiff's counsel did not qualify Mr. Philbrick as an expert on the tracking standard of care until well into his testimony. And so that was a major part of the problem. He just — he didn't do it until later in the testimony. And then you can see in the transcript, once he does, sustaining the Foundation objections either — I mean, it goes way down. It basically ends it. I mean, there might be one or two after that. The second category of questions to which objections were sustained, including at least one of the ones that counsel just mentioned, were questions where plaintiff's counsel was trying to get Mr. Philbrick to opine on areas outside of his expertise. Mr. Philbrick is a — he's a trucker. He's got 3 million, you know, accident-free miles. He's an expert on trucking safety. He's not a human factors expert. He does not — he's not qualified to say when a driver might perceive, you know, that a vehicle has stopped in the roadway. He's not an accident reconstructionist. He's not qualified to say how fast Mr. Maupin was going. And the plaintiff's — their main focus at the beginning, and you can see this in the opening statement, is they wanted Mr. Philbrick to say, you know, he's outside of his hours of service. He was, you know, he was fatigued. He was, you know, drinking, you know, rock star drinks or eating or whatever. But the, you know, the evidence at trial became clear that, first of all, he was — he was within his hours of service and he was not drinking, eating, smoking or on a cell phone when he was driving. And so, you know, plaintiff's counsel did run into problems when he tried to get him to opine things such as, you know, should — let's see, the one that Mr. Murphy just mentioned. The question was, you know, well, the standard of care for a professional driver, obviously, is to keep an eye out ahead 12 to 15 seconds ahead or more if you can. I'm sorry, the question was, what does the standard of care call for a professional driver in the operation of his vehicle under those circumstances? And Philbrick says, well, the standard of care for a professional driver, obviously, is to keep an eye out ahead 12 to 15 seconds ahead or more if you can. And in this case, the lighting was such that he could, I believe. Philbrick was — did not — plaintiff did not disclose any opinion from Philbrick on lighting and whether it was appropriate. And Philbrick was simply not qualified to testify as to whether Mr. Maupin could have seen the vehicle in time to stop. And so what you saw, I think, is a little bit of frustration on the district court's part with counsel's questions in trying to get Philbrick to testify outside the scope of this case. I just ask, your principal evidence as to what occurred was from eyewitnesses? There were two key witnesses for the defendants, Your Honor. The first was Mark Edwards. Mark — and I'm going to try to do this from memory. So the parties agreed that based on the ECM data, Mr. Maupin lifted his — lifted his foot from the throttle and moved it to the brake between 1.5 and 2 seconds. So giving the benefit of the doubt, that's 2 seconds or about 200 feet before the point of impact, okay, because you're — at 65 miles an hour, you're going about 95 feet per second. But Mr. — what Dr. Edwards said is that it takes about 1.3 to 1.5 seconds to do that motion, to take your foot off and put it on the brake, which takes you up to 350 feet before the point of impact. And Dr. Edwards did assume that Maupin would have looked at his — in his mirror, and he said that it would take one second per mirror. And so just one mirror brings you up to about 450 feet before the point of impact. 440 feet — not 600 feet — 440 feet was the distance that Dr. Edwards said Mr. Maupin should have realized how fast he was closing in on the Honda and that he needed to take — take action. Now, counsel, you know, you know, cites Maupin's testimony that he looked in the left lane and it was clear. Well, Ashley Brink said the opposite. Ashley Brink was an eyewitness to this accident, and she said — very, very specifically, she said there was an SUV in the lane to the left of Maupin and that he could not make a safe lane change, and that it appeared to be inevitable in her view. The jury could have accepted her testimony on that point over Maupin's, and the verdict is amply supported by the record, and we would ask the Court to affirm. Thank you. Unless you have any further questions. Thank you. Please, the Court. My name is Ron Mercaldo. I represent Oscar Aguilar. In October of 2013, Your Honors, I will tell you that Oscar Aguilar was denied a fair trial. He was denied a fair trial by the actions of Judge Ronald Liu, presided over this case, came into the case very shortly before the trial, did not have a pretrial conference, did not want to meet the lawyers before. Before Dyer was conducted, opening statements were made. The first witness plaintiff put on was attacked by Judge Liu in ways that I've never seen before, and I've tried over 200 trials. I've been trying cases for 45 years. I've never seen the hostile environment in a courtroom that Judge Liu demonstrated, and I don't make this claim lightly. Filing an affidavit questioning the conduct of a trial judge to me was something that I struggled with because it was just so unusual, the atmosphere. But this witness was gutted. He was not allowed to answer questions. Every question that was asked was objected to on the basis of foundation, and the foundation questions that were asked were objected to on the basis of foundation. Was that failed record? And they were all sustained. Yes, Your Honor, it's all on the record. For example, let me just suggest that question at page 171 of the transcript, lines 2 through 8. How did you find the lighting to be with regard to your ability to see the roadway a quarter of a mile ahead? Foundation, Your Honor, court's ruling, sustained. Why don't you narrow it down? And I said, I'm sorry, sir, and he goes, well, I'm not going to help you. Sustained. Two times during Mr. Philbrick's testimony, I was admonished that I was in a court of law and I was asking improper questions that the court was not going to tolerate. At one time, Mr. Philbrick started explaining his answer, and he is a qualified expert. He is a forensic examiner. He has driven trucks himself for 20 years, accumulated 3 million miles of accident-free driving. He is a driving instructor, and he was a police officer for 8 years patrolling the highways. He is an extremely well-qualified expert. Judge Liu would not entertain any of his opinions, would not allow him to explain his answers, insisted that he answer questions with yes or no answers. At one point, Mr. Philbrick, and I call Mr. Philbrick our most important witness because he's a truck driver by training and by incredible experience, he knows what it's like to sit up at the position that truck drivers have the vantage point, and he wanted to testify, or we wanted him to testify about the observations he could make from there, all of which was disclosed in reports that were disclosed and filed with the court. Judge Liu was looking at some brief synopsis from a pretrial statement, and when Mr. Philbrick would deviate from what was contained in that little synopsis, Judge Liu would say, you can't go on and on like this. You're invading the province of the jury. You cannot do that. And so he took away the credibility of my key witness. He took away my credibility by admonishing me in front of the jury that I was in a court of law and not acting appropriately. And then he attacked Mr. Aguilar when he was talking about the traditions of the courtship traditions in his culture. Judge Liu said to him, your country is the United States. That's the country you're from. And it was just so incredibly biased. The prejudice that he showed, the jury took it and took away all the credibility from the plaintiff's case. And it was the most incredible thing I've ever seen to see a judge conduct his court that way until he took us into chambers, pointed his finger at me and said, I will not have any runaway verdicts in my courtroom. And I asked him what he meant, and he said, you know what I mean. I'm not going to have any runaway verdicts in my courtroom. Then it became clear to me he was demonstrating his power, unlimited power that a trial judge has to control the jury. Thank you. Thank you, counsel. Thank you. The case is argued and will be submitted.
judges: Reinhardt, Owens, Mendoza